UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD WILLIS AND VIOLA WILLIS<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>BUFFALO PUMPS INC., et al.<br><br>　　　　　Defendants. | Case No.: 12cv744 BTM (DHB)<br><br>**ORDER DENYING DEFENDANT JOHN CRANE'S MOTION FOR SUMMARY JUDGMENT** |

Defendant John Crane Inc. has moved for Summary Judgment against Plaintiff Viola Willis. (Doc. 230). For the following reasons, Defendant's motion is DENIED.

**BACKGROUND**

Plaintiff Donald Willis was allegedly exposed to asbestos while serving in the United States Navy between 1959 and 1980 as a result of his work with asbestos-containing products. (Doc. 291, First Amended Complaint ("FAC") ¶ 2; Exhibits A, C). Defendant purportedly manufactured and supplied asbestos-containing gasket material sheets and packing material to the United States Navy. (Doc. 260-4, Plaintiff's Exhibit C, Deposition of Donald Willis ("Willis Depo.") 146:6-147:7, 223:2-7, 444:15-20, 845:22-846:22, 866:1-13, 910:6-16 ).

1

In 2012, Donald Willis was diagnosed with Malignant Mesothelioma - a form of cancer caused by inhalation of asbestos particles. (FAC ¶¶ 1, 3, Exhibit B). Donald Willis and his wife, Viola Willis, brought suit advancing a number of claims including negligence, strict liability, false representation, intentional failure to warn, premises owner/contractor liability, and loss of consortium. (FAC ¶¶ 20-125).

Donald Willis died from Malignant Mesothelioma on May 5, 2013. (FAC ¶ 1, Exhibit B). Viola Willis subsequently amended the complaint to include a cause of action for wrongful death and was substituted in her deceased husband's place so that she could assert his original claims. (FAC ¶¶ 8-10, 86-121; Doc. 285, Order Granting Motion for Leave to File an Amended Complaint; Doc. 300, Order Granting Motion to Substitute). Defendant now moves for summary judgment. (Doc. 230).

## LEGAL STANDARD

A motion for summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party bears the burden of proof and "must produce either evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000) (citing High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 574 (9th Cir. 1990)); see also Cleotex Corp v. Catrett, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

Finally, when ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the

nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

## ANALYSIS

Defendant advances several arguments in favor of summary judgment. First, Ms. Willis is not the real party in interest to Plaintiff's claims for negligence, strict liability, false representation, and intentional failure to warn. Second, Plaintiff cannot establish that Defendant's products caused Mr. Willis's mesothelioma. Third, Plaintiff is not entitled to punitive damages. The Court will consider each of these arguments in turn.[1]

### I. Real Party in Interest

Defendant argues that Viola Willis is not the Real Party in Interest, and thus cannot prosecute her deceased husband's claims against Defendant for negligence, strict liability, false representation, and intentional failure to warn.

Pursuant to Fed. R. Civ. P. 17(a), "[a]n action must be prosecuted in the name of the real party in interest." Generally, to meet this requirement, a plaintiff "must allege facts sufficient to reveal that he suffered an injury, that the injury was caused by the defendant's illegal conduct, and that his injury could be redressed by a favorable outcome to the lawsuit." Seckler v. Star Enterprise, 124 F.3d 1399 (11th Cir. 1997). As the Ninth Circuit has explained, "'[t]he modern function of the rule . . . is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata.'" U-Haul Intern., Inc. v. Jartran, Inc., 793 F.2d 1034, 1039 (9th Cir. 1986) (quoting Note of Advisory Committee on 1966 Amendment to Fed. R. Civ. P. 17). However, Rule 17(a) recognizes that executors, among others, "may sue in their own names without joining the person for whose benefit the action is brought."

---

[1] Defendant has advanced several evidentiary objections to Plaintiff's opposition. The Court has resolved these objections in a separate order.

1    Plaintiff Viola Willis is the wife of decedent Donald Willis, who died on May
2 5, 2013. After this motion was filed, Plaintiff demonstrated to the Court's satisfaction
3 that Donald Willis was deceased and Viola Willis had been named as the personal
4 representative of his estate. The Court subsequently ordered that Viola Willis be
5 substituted as Plaintiff and be allowed to pursue her deceased husband's claims in
6 addition to her own claims against Defendant. (Doc. 300). Accordingly, Defendant's
7 argument that Ms. Willis is not the real party in interest fails.

8    **II. Causation**

9    Defendant contends that Plaintiff cannot prove an essential element of her loss-
10 of-consortium claim: that decedent worked with or around Defendant's products and
11 that Defendant thereby caused him to inhale asbestos fibers and develop
12 mesothelioma. Consistent with this Court's prior order allowing Plaintiff to amend
13 her complaint and noting that Defendants' summary judgment motions would apply
14 to all survivorship actions, the Court will extend Defendant's argument regarding
15 causation to each of Plaintiff's claims. (Doc. 285).

16    **A. Threshold Exposure**

17    Plaintiff's claims require proof that Defendant caused or contributed to Donald
18 Willis's exposure to asbestos. Rutherford v. Owens-Illinois, Inc., 16 Cal.4th 953, 975
19 (1997) ("[P]laintiffs [bear] the burden of proof on the issue of exposure to the
20 defendant's product."); McGonnell v. Kaiser Gypsum Co., 98 Cal.App.4th 1098,
21 1103 (2002) ("A threshold issue in asbestos litigation is exposure to the defendant's
22 product. The plaintiff bears the burden of proof on this issue. If there has been no
23 exposure, there is no causation." (citations omitted)).

24    Plaintiff has advanced evidence that decedent was exposed to Defendant's
25 asbestos-containing products. Mr. Willis testified before his death that throughout his
26 military career he commonly used gasket material branded with the names "John
27 Crane," "Crane," and "Cranite," (Willis Depo. 146:6-147:7, 223:2-7, 444:12-22,
28 828:10 - 22, 920:2-13), and "Crane" brand packing material, (Id. at 845:14-846:22,

4

1  865:12-866:13, 877:9 -13, 946:14-947:4).

2  There is also evidence that John Crane sold asbestos-containing gaskets and
3  packing to the Navy. In 1931, the Navy approved Defendant's style 2150 gasket
4  material for supply to the Navy. (Doc. 234-1, Defendant's Exhibit H 337-38, Navy
5  Department Bureau of Engineering Letter and Certificate of Approval). Defendant
6  admitted that it manufactured asbestos-containing products from 1930 to 1985, which
7  varied in content from 5% to 80+% asbestos. (Doc. 260-5, Plaintiff's Exhibit D, In
8  Re: Complex Asbestos Litigation, No. 828 684, Answers of Defendant John Crane-
9  Houdaille, Inc. in Response to General Order No. 29 Interrogatories 6:4-18, 12:4-7).
10 Defendant's gasket sheet materials were "various shades of grey, with Defendant's
11 logo and the style number printed on the product," and its packing could be
12 "purchased in bulk form on a spool, or in pre cut rings," and some packing rolls were
13 a black graphite color. (Id. at 12:8-21). Decedent's testimony is consistent with these
14 descriptions. Mr. Willis testified that some of the gasket material he worked with was
15 grey (Willis Depo. 853:21-24), and the "Crane" packing he worked with was black
16 (Id. at 946:24-947:4).

17 Defendant argues that this evidence is insufficient to implicate John Crane Inc.,
18 and emphasizes decedent's testimony that he was uncertain if the words "John Crane"
19 appeared on any products he worked with:

> Q: So do you associate any product with the name John Crane?
> A: It could have said "John Crane" on it, but I know it said at least "Crane" on it.
> Q: But as you sit here today, sir, do you associate any product with the name John Crane?
> . . . .
> A. I -- I'm not sure at this time, no.

(Id. at 920:10-18). Defendant also cites to Mr. Willis's testimony wherein he
admitted that he could not normally identify the brand name on gaskets he removed

5

because the gaskets would tear (Id. at 918:15-919:6), and that he remembered only working with Chesterton and Garlock brand packing. (Id. at 924:1-22). Defendant notes that another company and defendant in this case is named "Crane Co.," and argues that decedent is likely identifying Crane Co., not John Crane Inc., as the brand he observed on the products he worked with.

The Court has spent a considerable amount of time reviewing the evidence and has held a separate hearing regarding this issue. This is a very close case. Mr. Willis's testimony most often identifies the products he worked with as being "Crane" brand. Further, as Defendant emphasizes, Mr. Willis equivocated on whether the products were labeled "Crane" or "John Crane." If decedent's testimony ended there, the Court would find that Plaintiff's testimony was so ambiguous as to preclude a finding of threshold exposure to Defendant's products. However, Plaintiff has identified several instances where Mr. Willis testified that he worked specifically with "John Crane" products. (Id. at 146:6-25, 920:10-13). Moreover, at one point in his testimony, decedent explained that when he said "Crane," he meant "John Crane." (Id. at 223:2-7).

Decedent also distinguished between two different kinds of gasket material he worked with during his career: grey colored material and tan colored material. (Id. at 853:1-856:14, 908:13-909:8). Mr. Willis identified the tan material as being a "Crane Co." or "Cranite" product, and suggested that the grey material was the gasket sheet material he had spoken about earlier in the deposition when he was discussing "Crane" or "John Crane" products. (Id.). Decedent's ability to distinguish between the two products and the fact that John Crane admitted to producing grey colored gasket material supports Plaintiff's claim and undermines Defendant's theory that Mr. Willis was confusing John Crane and Crane Co. products.

On a motion for summary judgment, the burden of proof falls on the moving party. Nissan Fire & Marine Ins. Co., 210 F.3d at 1102. Defendant must show that there is no preponderance of evidence by which a jury could find threshold exposure

to John Crane Products. But Defendant has not advanced any evidence or pointed to any absence of evidence which would fatally undermine Plaintiff's claim. Mr. Willis deposition testimony is equivocal and unclear in places, and a reasonable jury could well find his testimony to be unreliable on that basis. However, a reasonable jury could also find to the contrary. The Court finds that whether decedent was exposed to Defendant's products is a dispute of material fact and that Plaintiff has put forward sufficient evidence that, if credited by a jury, would form an adequate basis on which to conclude that Mr. Willis worked with and was exposed to John Crane Inc.'s asbestos-containing products.

However, the Court's holding on the issue of threshold exposure is without prejudice to a future motion for judgment as a matter of law at the close of Plaintiff's case. It is possible that the totality of evidence presented at trial may differ from what is before the Court now, and that the evidence will be seen in a different light when the burden of proof has shifted to Plaintiff. But, at this time, the Court is not convinced that Plaintiff cannot establish threshold exposure.

### B. Substantial Factor

Beyond threshold exposure, Plaintiff must also establish that Defendant's products were a "substantial factor in bringing about the injury." Rutherford, 16 Cal.4th at 982. To meet this standard, Plaintiff must produce evidence showing that Mr. Willis's "exposure to defendant's asbestos-containing product in reasonable medical probability was a substantial factor in contributing to the aggregate *dose* of asbestos . . . decedent inhaled or ingested, and hence to the *risk* of developing asbestos-related cancer." Rutherford, 16 Cal.4th at 976-77 (citation omitted). But Plaintiff need not prove "that fibers from the defendant's particular product were the ones, or among the ones, that *actually* produced the malignant growth." Id.

Plaintiff's evidence suggests that Defendant's products were a substantial factor in causing decedent's mesothelioma and death. Mr. Willis testified that packing and repacking of valves was "constant and ongoing," (Willis Depo. 868:4-

1  869:7), and that he personally cut lengths of packing material "[m]ultiple times,
2  many, many times." (Id. at 910:6-22). Furthermore, Mr. Willis explained that
3  removing gaskets required use of scrappers and wire brushes to remove gasket
4  residue from pipe flanges, which in turn generated dust in the air that he inhaled. (Id.
5  at 147:16-23, 220:4-222:11). He also stated that applying newly cut gaskets to pipe
6  flanges required use of a hammer and created dust. (Id. at 912:20-913:13). Mr. Willis
7  concluded that he breathed dust from gaskets "[a] lot of times. Quite a few -- I mean,
8  multiple times." (Id. at 222:13-17).
9        Moreover, Plaintiff has produced the expert report of Dr. Jerrold L. Abraham,
10 which explains that "[a]sbestos exposure is well recognized to be the cause of nearly
11 all malignant mesotheliomas," and that "Mr. Willis had a clearly documented history
12 of occupational asbestos exposure and developed a malignant mesothelioma of the
13 plerua."  (Doc. 234, Defendant's Exhibit G, Expert Report of Jerrold L. Abraham,
14 M.D.) The report concludes that "to a reasonable degree of medical certainty . . . Mr.
15 Willis' asbestos exposure was the cause of his malignant mesothelioma and will very
16 likely be the cause of his death." (Id.)
17       Furthermore, Dr. Abraham has testified that, if Mr. Willis did indeed work with
18 and around asbestos-containing John Crane gaskets and packing, and if such work
19 released asbestos fibers into the air and decedent breathed them, then "[t]hat would
20 form part of his substantial asbestos exposure and the development of his
21 mesothelioma substantially." (Doc. 260-8, Plaintiff's Exhibit G, Deposition Jerrold L.
22 Abraham, M.D. 28:8 - 29:23). Dr. Abraham further clarified that there was no safe
23 level of asbestos exposure. (Id. at 38:18-40:22).
24       Based on the foregoing, the Court finds that Plaintiff has presented sufficient
25 evidence to withstand summary judgment on the issue of causation. If credited by a
26 jury, Mr. Willis's testimony and Plaintiff's expert report and testimony provide a
27 sufficient basis to find that decedent worked with and around Defendant's asbestos-
28 containing products, that such products emitted asbestos dust into the air that Mr.

8

Willis breathed, and that such products were a substantial factor in causing decedent's illness and death. Defendant's motion for summary judgment on this basis is denied.

### III. Punitive Damages

Finally, Defendant seeks partial summary judgment as to Plaintiff's claim for punitive damages. Defendant advances several arguments on this issue. First, punitive damages are not recoverable under a loss of consortium claim. Second, Plaintiff cannot establish by clear and convincing evidence that Defendant's managing agents acted with malice towards decedent. Third, Plaintiff's punitive damage claims should be stricken or severed on public policy grounds.

#### A. Loss of Consortium

Defendant contends California law does not recognize the availability of punitive damages for loss of consortium claims. To the contrary, the California Supreme Court appears to have expressly recognized the availability of punitive damages for loss-of-consortium claims while rejecting the availability of such damages in wrongful-death claims. Boeken v. Philip Morris USA, Inc., 48 Cal.4th 788, 796 (2010). See also Rodriguez v. Bethlehem Steel Corp., 12 Cal.3d 382, 408 (1974); Cal. Civ. Code § 3294(a). Regardless, the issue is moot. Plaintiff has only sought punitive damages for the claims she is pursuing as personal representative of the estate of Donald Willis. (FAC 36:1 - 37:6). In regard to her personal claims, Plaintiff is only seeking "damages for loss of consortium and/or society according to proof."

#### B. Plaintiff's Proof of Entitlement to Punitive Damages

Defendant further argues that Plaintiff cannot establish the requisite elements for punitive damages by clear and convincing evidence. The availability of punitive damages is a question of state law. Central Office Tel. v. AT&T Co., 108 F.3d 981, 993 (9th Cir. 1997), rev'd on other grounds, 524 U.S. 214, 228 (1998). To obtain punitive damages under California law, the plaintiff must establish "by clear and

9

convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a); see also Basich v. Allstate Ins. Co., 87 Cal.App.4th 1112, 1121 (2001) ("[O]n a motion for summary adjudication with respect to a punitive damages claim, the higher evidentiary standard applies. If the plaintiff is going to prevail on a punitive damages claim, he or she can only do so by establishing malice, oppression or fraud by clear and convincing evidence.").

Plaintiff's complaint and opposition brief argue that Defendant's conduct was malicious. Malice is defined by § 3294(c) as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." To establish the existence of "conscious disregard," the plaintiff may show "that the defendant was aware of the probable dangerous consequences of its conduct and that it willfully and deliberately failed to avoid those consequences." Hilliard v. A.H. Robins Co., 148 Cal.App.3d 374, 395 (1983) (internal quotation marks and citation omitted). In other words, defendant must "have *actual knowledge* of the risk of harm it is creating and, in the face of that knowledge, fail to take steps it knows will reduce or eliminate the risk of harm." Ehrhardt v. Brunswick, Inc., 186 Cal.App.3d 734, 742 (1986).

Additionally, Cal. Civ. Code § 3294(b) imposes a heightened bar for obtaining punitive damages against corporations:

> An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of

> oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation.

Thus, Plaintiff must show that the alleged malice occurred at a high level within John Crane Inc. While this evidentiary burden is high, it is not insurmountable. Plaintiff need not produce a smoking memorandum signed by the CEO and Board of Directors. Rather, California law permits a plaintiff to satisfy the "managing agent" requirement

> through evidence showing the information in the possession of the corporation and the structure of management decisionmaking that permits an inference that the information in fact moved upward to a point where corporate policy was formulated. These inferences cannot be based merely on speculation, but they may be established by circumstantial evidence, in accordance with ordinary standards of proof.

Romo v. Ford Motor Co., 99 Cal.App.4th 1115, 1141 (2002) ("It is difficult to imagine how corporate malice could be shown in the case of a large corporation except by piecing together knowledge and acts of the corporation's multitude of managing agents."), vacated and remanded on other grounds, 538 U.S. 1028 (2003).

Plaintiff has advanced substantial evidence that Defendant had actual knowledge of the danger created by inhalation of asbestos fibers before and during decedent's exposure to Defendant's products. Defendant's representative testified that John Crane became aware that asbestos could be hazardous in 1970 when company representatives attended a Mechanical Packing Association meeting, wherein the dangers of asbestos fibers and smoking were discussed. (Doc. 234-1, Defendant's Exhibit H, Plaintiff's Responses to Interrogatories Exhibit B, Deposition of George McKillip ("McKillip Depo.") 43:11-14, 44:4-9). After that meeting, Defendant placed warnings signs in its plant that forbid smoking, drinking, and eating in areas where asbestos was being used, and began monitoring its workers, but

11

did not provide any warning on its products. (Id. at 44:23-45:17). Plaintiff has also produced one of Defendant's internal memoranda, dated July 28, 1972, which directs that employees of Defendant's packing division who came in contact with asbestos fibers would be sent to a clinic for chest x-rays every 3-4 months. (Doc. 234-1, Defendant's Exhibit H, Plaintiff's Responses to Interrogatories Exhibit C, Crane Packing Company Memorandum).

Furthermore, there was an increasing public awareness of the dangers of asbestos as early as the 1950s and 1960s. A Newsweek article dated May 15, 1950, stated that

> Studies conducted by the United States Public Health Service now point to airborne particles as the cause of some forms of cancer and respiratory ailments. . . . Dr. W.C. Hueper of the National Cancer Institute, Bethesda, Maryland, referred specifically to air pollution with asbestos, selenium, beryllium, arsenic and chromates as the probable cause of increased lung and respiratory tract cancer.

(McKillip Depo. 111:21-113:2).

Additionally, the 1952 edition of Encyclopedia Britannica, describing occupational cancers, stated that "[c]ancers of the respiratory tract . . . occur in workers who are exposed to the inhalation of chrome salts, asbestos dust and nickel carbonyl." (Id. at 114:3-115:13). A Wall Street Journal article dated March 3, 1966, stated that "[a]sbestos dust which has already been connected with a development of fatal cancers in one-half of asbestos workers may be a potential health hazard[] of one-quarter of the population or more." (Id. at 116:18-117:18). While Plaintiff has presented no direct evidence that these publications were read by Defendant's managing agents, a reasonable jury could infer that the managing agents of a corporation that manufactured and sold a substance that was the subject of discussion in media publications for its potential toxicity would be aware of those publications' content.

1    Defendant contends that it believed during the relevant periods that asbestos
2    encased in gasket material and packing was non-friable during the course of
3    reasonably foreseeable use, and thus did not pose a danger to its users comparable to
4    conventional asbestos insulation. However, there is evidence that Defendant had
5    actual knowledge that asbestos-containing gaskets left residue behind on pipe flanges
6    when the gaskets were removed, and that end-users often used scrapers, solvents,
7    conventional and powered wire brushes, and saws to remove gasket residue. (Id. at
8    67:18-69:18). In fact, Defendant's own gasket instructions noted that users would
9    often have to scrape pipe flanges clean before installing a new gasket. (Id. at 63:22-
10   64:12, 66:20-67:17). Moreover, Defendant knew that new gaskets would be struck
11   with hammers and sliced with cutters, and that packing material was sometimes
12   removed from valves with compressed air. (Id. at 69:19-70:16, 65:18-66:6).
13   Given Defendant's knowledge that their asbestos-containing products were
14   torn, scraped, brushed, sawed, hammered, cut, and blown as part of their normal
15   usage, a jury could conclude that Defendant had actual knowledge that its asbestos-
16   containing gaskets and packing would, in the course of reasonably foreseeable use,
17   become friable and emit asbestos fibers into the air -- fibers which it knew were
18   dangerous.
19   Plaintiff has also advanced substantial evidence that Defendant was not only
20   conscious of the risks posed by its products, but also disregarded those risks. Despite
21   the knowledge that asbestos was dangerous and that asbestos-containing gaskets and
22   packing could release asbestos fibers into the air as a consequence of their normal
23   use, Defendant never conducted medical research to determine if its product materials
24   were hazardous, never contributed funds to research asbestos and its relation to
25   disease, and never employed an industrial hygienist to evaluate asbestos-related
26   concerns. (Id. at 104:4-105:13). Moreover, prior to 1970, Defendant did not test its
27   asbestos-containing products to determine how much asbestos dust was released from
28   them, and prior to 1983, provided no warnings on their products. (Id. at 47:6-11,

49:6-16).

The Court concludes that Defendant has not carried its burden of showing that Plaintiff "does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., 210 F.3d at 1102. Based on Plaintiff's evidence, a reasonable jury could conclude that Defendant's managing agents had actual knowledge that their asbestos-containing gaskets were dangerous and would substantially increase the risk of asbestos-related illness for those working with them, and further that Defendant consciously disregarded these risks during the time of Plaintiff's exposure by continuing to manufacture and sell asbestos-containing gaskets without providing any warning to end-users. Accordingly, Defendant's motion for partial summary judgment on this basis is denied.

### C. Public Policy Considerations

Defendant argues that public policy considerations militate against the award of punitive damages in asbestos cases. First, Defendant argues that punitive damages would not serve their intended purpose as a deterrent in this case because Defendant no longer manufactures or sells asbestos-containing products. Second, Defendant reasons that punitive damages would deplete its limited resources and thereby deprive future asbestos litigants of potential compensation.

Defendant's cessation of producing and selling asbestos-containing products and their concern for future asbestos litigants are both laudatory. However, the Court declines to decide a question of public policy absent the necessity of doing so. At this time, it is uncertain if Plaintiff will actually prevail and obtain punitive damages. Once trial has been completed and Defendant's liability, if any, is established, the Court would consider arguments premised on policy considerations. At present, Defendant's argument is premature, and accordingly rejected without prejudice. See In re Related Asbestos Cases, 543 F. Supp. 1152, 1157 (N.D. Cal. 1982) (finding pretrial resolution of policy and constitutional arguments against punitive damages

unnecessary and inappropriate).

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is DENIED.

Generally, motions for reconsidering are disfavored. Am. Rivers v. NOAA Fisheries, 2006 U.S. Dist. LEXIS 48195, at *8 (D. Or. July 14, 2006) (citing Fuller v. M.G. Jewelry, 950 F.2d 1437, 1442 (9th Cir. 1991)). Moreover, the Court has devoted a very substantial amount of time to deciding this motion. A pretrial conference is approaching. Therefore, to avoid further delays, any party wishing to make a motion for reconsideration as to any issue resolved in this order my do so only within seven calendar days of the entry of this order. The motion papers are limited to an absolute number of five pages. If the Court believes that further briefing and/or a response is required, the Court will enter an order for such briefing.

IT IS SO ORDERED.

Dated: August 1, 2014

_____
BARRY TED MOSKOWITZ, Chief Judge
United States District Court